# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARREN E. GOODEN,

                    *Plaintiff,*

    v.

AARON WALTON, et al.,

                    *Defendants.*

CIVIL ACTION
NO. 21-190

**PAPPERT, J.**                                     **September 13, 2022**

## MEMORANDUM

Warren Gooden, a tenured chemistry professor at Cheyney University, a state institution, alleges he was unable to teach his organic chemistry class or access his valuable personal research when the university, without notice to Gooden, leased his research lab to Epcot Crenshaw Inc.—a science and technology company headquartered at Cheyney. According to Gooden, Cheyney's president, Aaron Walton, defamed Gooden by telling his students it was his fault their lab was canceled.

Gooden initially filed his lawsuit *pro se*, subsequently obtained counsel and in total has submitted four complaints.[1] He asserts claims under the U.S. Constitution, federal and state statutes and state common law against two sets of Defendants: Cheyney, Walton and other university and education officials ("Commonwealth Defendants"), and Epcot and its CEO, Charles Smith ("Epcot Defendants"). Defendants filed separate motions to dismiss all claims against them, and the Court grants them in

---

[1]    The Court presented this case's procedural history in relevant part in its June 13, 2022 Order. (ECF 27.)

part and denies them in part.  Most of Gooden's claims are either barred by sovereign immunity or fail on the merits.  Gooden, however, has plausibly alleged Walton deprived him of due process, that Walton committed negligence and that Epcot, through Smith, intentionally interfered with Gooden's contract with Cheyney to teach and conduct research in its lab space.

I

A

1

In the fall 2019 semester, Gooden taught his Organic Chemistry I lab in room 308.[2]  (Pl's Third Am. Compl. ¶ 28, ECF 23-2.)  On January 21, 2020, Gooden's Organic Chemistry II lab (which comprised the same students) gathered outside room 308 for its first meeting of the spring 2020 semester.  (*Id.*)  Gooden couldn't open the door, however, because his key did not work.  (*Id.* at ¶ 29.)  No one told Gooden he would be teaching his Organic Chemistry II lab in a different classroom.  (*Id.* at ¶¶ 33, 38.)

In fact, Walton had leased Epcot room 308, among other university lab space that Gooden was contractually entitled to use.  (*Id.* at ¶¶ 53–54.)  As a result, Epcot became "completely in charge" of the science building.  (*Id.* at ¶¶ 85, 108.)  Room 308's lock was changed, and Smith had a key—but Gooden did not.  (*Id.* at ¶ 57.)

Gooden's students, however, expected the chemicals, equipment and data they left in room 308 the prior semester would remain in place and available for their next

---

[2]      Gooden seemingly refers to rooms 308 and 318 interchangeably.  The Court uses only the former in this Memorandum.

lab.  (*Id.* at ¶ 30.)  Room 308 also contained Gooden's personal research.  *See* (*id.* at ¶¶ 58, 64, 86).

Specifically, Gooden claims he discovered a plant that has killed the herpes virus in lab tests and is considered a possible cancer treatment.  (*Id.* at ¶¶ 21, 87–88.)  In the fall of 2019, Gooden told Walton about his research in room 308 and its potential financial benefit to Cheyney, and Walton told Gooden he wasn't interested.  (*Id.* at ¶¶ 22–24.)  Later in the semester, Epcot asked Gooden if it could finance the production of his product, and Gooden said no.  (*Id.* at ¶¶ 26–27.)  Moreover, Gooden has researched antiviral drugs, and a "major pharmaceutical company" asked him to consult on an antiviral COVID-19 treatment.  (*Id.* at ¶¶ 20, 91.)  Gooden couldn't accept the offer because he lacked access to his personal data.  (*Id.* at ¶¶ 63, 91.)

When Gooden's students asked him why they were locked out of room 308 for their first Organic Chemistry II lab, he said he didn't know and suggested they ask Walton.  (*Id.* at ¶¶ 34–35.)  Walton told the two students who spoke with him in his office that it was Gooden's fault class was canceled.  (*Id.* at ¶¶ 36, 40.)  Walton also reprimanded Gooden in writing and placed the document in his personnel file.  (*Id.* at ¶ 46.)

2

The Organic Chemistry II lab room was reassigned from 308 to 208—a "ghost" lab lacking organic chemistry supplies.  (*Id.* at ¶¶ 37–38.)  Gooden aggravated a prior hernia injury while gathering materials for and setting up room 208.  (*Id.* at ¶¶ 43, 61.)  Gooden is also receiving care for distress and anxiety caused by Defendants' allegedly unlawful conduct.  (*Id.* at ¶ 128.)

Gooden filed grievances with the state faculty union over his denial of access to room 308 and loss of supplies and his research, but they were not timely processed and his rights not protected.  (*Id.* at ¶¶ 32, 50, 74, 126, 132.)  Epcot returned some of the supplies during the spring 2020 semester, but most of them were not replaced.  (*Id.* at ¶¶ 78–80.)  Gooden also never received his valuable personal data.  (*Id.* at ¶ 86.)

B

On October 5, 2021, Gooden filed his Third Amended Complaint.  (ECF 23-2.) Gooden's document is confusing, scattershot and pretty much all over the place, but he asserts claims for a procedural due process violation against all Defendants in count one, negligence (apparently) against all Defendants in count two, constructive discharge against Cheyney and Walton in count three, an Americans with Disabilities Act violation against all Defendants in count four, defamation against Walton in count five and intentional interference with contractual relations and prospective economic advantage against Epcot and Smith in count six.  (Pl's Third Am. Compl. ¶¶ 133–177.)

On June 27, 2021, the Commonwealth Defendants moved to dismiss the Third Amended Complaint.  (ECF 29).  The Epcot Defendants filed a separate motion for dismissal.  (ECF 28.)

II

To avoid dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual content to state a claim that is facially "plausible."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when the facts pleaded permit a court to make the reasonable inference that a defendant is liable

for the alleged misconduct. *Id.* If the court can infer only the possibility of misconduct

from the "well-pleaded" facts—those supported by sufficient factual content to make

them facially plausible—the complaint has not shown the pleader is entitled to relief.

*Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *Schuchardt v. President of the United States*,

839 F.3d 336, 347 (3d Cir. 2016).

       Determining plausibility is a "context-specific task" requiring a court to use its

judicial "experience and common sense." *Schuchardt*, 839 F.3d at 347 (quoting *Iqbal*,

556 U.S. at 675). The court disregards a complaint's legal conclusions, assumes well-

pleaded facts are true and then determines whether those facts plausibly entitle the

pleader to relief. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016);

*Schuchardt*, 839 F.3d at 347. In doing so, the court construes well-pleaded facts in the

light most favorable to the plaintiff and draws reasonable inferences from them.

*Connelly*, 809 F.3d at 790.

       To state a claim under § 1983, "a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the

alleged deprivation was committed by a person acting under color of state law." *West v.

Atkins*, 487 U.S. 42, 48 (1988). To act under color of state law, a defendant must have

exercised power possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law. *Harvey v. Plains Twp. Police

Dep't,* 635 F.3d 606, 609 (3d Cir. 2011). Personal involvement of each defendant is a

required element under § 1983, and, therefore, a plaintiff must allege how each

defendant was involved in the events and occurrences giving rise to the claims. *See

Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998); *see also Dooley v. Wetzel*, 957

F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'") (quoting *Rode*, 845 F.2d at 1207).

III

A

While Gooden's Fourteenth Amendment procedural due process claim in count one is formally against all Defendants, he essentially contends Walton and Cheyney deprived him of due process by leasing Epcot room 308 without notifying Gooden or providing an alternative workspace.  (Pl's Third Am. Compl. ¶ 136.)

To state a § 1983 procedural due process claim, a plaintiff must allege (1) he was deprived of a personal interest encompassed in the life, liberty or property protected by the Fourteenth Amendment and (2) a lack of procedures that provide due process.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006).  There are many types of property interests and they are defined by an "independent source" like state law.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972).  A plaintiff asserting a property interest in a benefit must have a "legitimate claim of entitlement" to it.  *Id.* at 577.  Additionally, due process's "fundamental" requirement is an opportunity to be heard in a "meaningful" time and manner.  *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

Gooden has not adequately pleaded his procedural due process claim against the Defendants—with the exception of Walton.  To begin, as a member of Pennsylvania's State System of Higher Education, Cheyney is an "arm of the state" protected by Eleventh Amendment immunity.  *Bradley v. West Chester Univ. of Pennsylvania State*

6

*Sys. of Higher Educ.*, 880 F.3d 643, 654 (3d Cir. 2018).  Actions against state officials, such as Walton, in their official capacities are treated as actions against the state.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Gooden has, however, adequately shown that Walton, in his individual capacity, deprived Gooden of his property and denied him a meaningful opportunity to be heard. *See Roth*, 408 U.S. at 576–77; *Mathews*, 424 U.S. at 334–35.  Gooden contends Walton leased room 308—in which Gooden was contractually entitled to conduct research and which Walton knew contained his intellectual property—to Epcot without notifying Gooden or providing an adequate alternative.  *See also* (Pl's Third Am. Compl. ¶ 135 (invoking provision in union-state education system CBA requiring Cheyney to provide Gooden with "suitable" facilities and office space maintained by the university)).

Gooden also asserts the grievances he filed with the union were not promptly or properly processed.  *See Hill*, 455 F.3d at 233–34.  Taking as true Gooden's claims that such grievances were filed in accordance with the CBA and reasonably inferring from those claims that he properly availed himself of the available remedies, Gooden has, at this stage, plausibly alleged the grievance procedures afforded to him did not provide due process of law. *See id.* at 234 (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). [3]

---

[3]       The Commonwealth Defendants invoke qualified immunity, which shields state officials from liability if their conduct doesn't violate a clearly established constitutional right.  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*).  Gooden plausibly alleges Walton's conduct did.  *See L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247 (3d Cir. 2016) ("ultimate question" is whether the law gave official "fair warning" his alleged conduct was unconstitutional (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

In addition, to the extent Gooden alleges anything against the other Defendants in count one, his claim fails either because of Eleventh Amendment immunity or a lack of personal involvement.  *See Hafer*, 502 U.S. at 25; *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Finally, Gooden brings a facial constitutional challenge to the arbitration clause in the collective

B

Again, while Gooden asserts his negligence claim in count two against all Defendants, he effectively alleges Walton leased Epcot room 308, including its contents such as his supplies and personal research.  (Pl's Third Am. Compl. ¶¶ 139–43.)

The Pennsylvania General Assembly has waived sovereign immunity as a defense for "Commonwealth parties" against negligence claims over the care, custody or control of personal property in their possession or control. 42 Pa. Stat. and Cons. Stat. § 8522.  Commonwealth parties include state universities and their employees as to acts within the scope of their employment.  § 8501; *Armenti v. Pennsylvania State Sys. of Higher Educ.*, 100 A.3d 772, 777 (Pa. Commw. Ct. 2014).  To avoid dismissal on a negligence claim under Pennsylvania law, a plaintiff must show the Defendant had a duty of care, he breached it, a causal connection between the breach and plaintiff's injury and actual damage.  *Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264, 1272–73 (Pa. 2006).

Gooden has plausibly alleged a negligence claim against Walton and Cheyney.[4] As an initial matter, the parties do not dispute that Walton was acting within the scope of his Cheyney employment when he leased Epcot room 308.  Still, sovereign immunity does not bar Gooden's claim.  *See* § 8522(b)(3).  Gooden has plausibly alleged Walton breached his duty to ensure Gooden's intellectual property remained accessible to him,

---

bargaining agreement between the faculty union and state education system.  (Pl's Third Am. Compl. ¶¶ 127, 137–38).  The Court has no basis to invalidate that clause.

[4]     Gooden does not allege any of the other Defendants were involved in the misconduct on which count two is based.

8

in Cheyney's control, and that this caused Gooden potentially significant financial harm. *See Farabaugh*, 911 A.2d at 1272–73. According to Gooden, Epcot took control of and never returned his valuable personal research, and his lack of access to room 308 prevented him from consulting on a COVID-19 drug. (Pl's Third Am. Compl. ¶¶ 20, 86.) Additionally, Gooden's plausible claim against Walton gives rise to vicarious liability against Cheyney. *See Scampone v. Highland Park Care Ctr.*, LLC, 57 A.3d 582, 597 (Pa. 2012).[5]

## C

Gooden asserts in count three, pleaded against Cheyney and Walton, that Walton constructively discharged him by leasing Gooden's research lab and its contents to Epcot and thereby denying Gooden the "requisite implements" of his profession. (Pl's Third Am. Compl. ¶¶ 145–47.) Gooden also alleges Walton allowed an unidentified "corporate partner[]" to place radioactive tape in room 208. (*Id.* at ¶¶ 150–54.)

To state a constructive discharge claim under Pennsylvania law, a plaintiff must demonstrate the employer made working conditions so intolerable they forced the plaintiff to resign. *Helpin v. Trs. of Univ. of Pennsylvania*, 969 A.2d 601, 614, n.8 (Pa. Sup. Ct. 2009). He must have actually resigned. *See Kegerise v. Delgrande*, 183 A.3d 997, 1003–04 (Pa. 2018).

As an initial matter, Commonwealth parties like Cheyney and Walton enjoy state sovereign immunity from intentional tort claims such as constructive discharge.

---

[5]     The Commonwealth Defendants argue Gooden's claim fails because his alleged injury was caused by Walton's care of his personal research, rather than the research itself. Applicable case law indicates otherwise. *See e.g.*, *Williams v. Stickman*, 917 A.2d 915, 917–18, n.2 (Pa. Commw. Ct. 2007) (finding the personal property exception to sovereign immunity does not require a causal relationship between injury and property when the injury alleged is the loss of the property itself).

*See Kull v. Guisse*, 81 A.3d 148, 157 (Pa. Commw. Ct. 2013). Even if they didn't, Gooden's claim would fail because he never resigned from Cheyney. *See Kegerise*, 183 A.3d at 1003–04. Instead, Gooden alleges he is on medical leave. (Pl's Third Am. Compl. ¶ 156.)

## D

In count four, Gooden claims Walton violated the ADA by creating a toxic, hostile and retaliatory work environment that caused Gooden to go on medical leave and receive treatment. (Pl's Third Am. Compl. ¶ 156.) A plaintiff alleging a hostile work environment under the ADA must demonstrate (1) he suffered intentional discrimination because of his disability, (2) the discrimination was "severe or pervasive," (3) the discrimination affected him detrimentally, (4) the discrimination would detrimentally affect a "reasonable person in like circumstances" and (5) *respondeat superior* liability. *See Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

To start, as an employee, Walton—as well as the other individual Defendants— cannot face personal damages liability under the ADA. *Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274, 289 (3d Cir. 2006). As for Cheyney, Gooden has not plausibly alleged a hostile work environment. *See Mandel*, 706 F.3d at 167. He does not identify his disability, much less contend he suffered discrimination on account of it. *See Walton v. Mental Health Ass'n of Se. Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999); *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006). Gooden's allegations that he

reinjured his hernia and suffered anxiety and distress are insufficient.  *See* 42 U.S.C. §

12102 (defining disability).[6]

E

Gooden asserts in count five that Walton defamed him by telling two of Gooden's

students it was his fault their first Organic Chemistry II lab was canceled.  (Pl's Third

Am. Compl. ¶ 161.)  Gooden contends Walton's statements constitute both types of

defamation: slander (oral) and libel (written).  (*Id.* at ¶¶ 162, 164.)

In either case, to state a defamation claim under Pennsylvania law, a plaintiff

must allege (1) the communication has a defamatory character, (2) the defendant

published it, (3) it applies to the plaintiff, (4) the recipient understands its defamatory

meaning, (5) the recipient understands it is intended to apply to the plaintiff and (6)

special harm.[7]  42 Pa. Stat. and Cons. Stat. § 8343(a).  A statement has a defamatory

character—a legal question for the court—if it lowers the plaintiff in the community's

estimation or deters third parties from dealing or associating with him by harming his

reputation.  *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004); *Blackwell v.*

*Eskin*, 916 A.2d 1123, 1125 (Pa. Sup. Ct. 2007).  The plaintiff cannot be just annoyed or

embarrassed by the statement, but rather must have his standing in the community

"grievously fractured."  *Tucker*, 848 A.2d at 124 (internal quotation marks omitted).

---

[6]     Gooden's ADA allegations do not even mention Epcot, the remaining Defendant in count four.

[7]     A plaintiff need not prove special harm—that is, monetary loss—if the communication constitutes slander *per se*.  *See Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 248 (Pa. 2002).  The only conceivably applicable type of slander *per se* is a statement that imputes to the plaintiff conduct that would "adversely affect" him in his business or trade.  *Walker v. Grand. Cent. Sanitation, Inc.*, 634 A.2d 237, 244 (Pa. Sup. Ct. 1993).  Here, Gooden does not plausibly allege the allegedly defamatory statement had this effect on him.  *See infra* Section III.E.

Again, as a Commonwealth party, Walton enjoys state sovereign immunity from intentional tort claims like defamation. *See Kull*, 81 A.3d at 157. Even if he didn't, Gooden has no libel claim because the allegedly defamatory statement was spoken, not written. *See Sobel*, 531 A.2d at 522.

Gooden's slander claim fails too because he cannot demonstrate Walton's statement was defamatory. *See* § 8343(a). Gooden alleges Walton told two students in his office that Gooden was responsible for the cancellation of one class but made no other statements about his qualifications as a professor. Walton's statement may have embarrassed Gooden, but he cannot show it caused him any reputational harm, let alone grievous harm. *See Tucker*, 848 A.2d at 124; *cf. Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 489 A.2d 1364, 1368–70 (Pa. Sup. Ct. 1985) (no defamatory character when physicians told high-ranking hospital officials they lacked trust and confidence in plaintiff-physician, are "totally unhappy" with him and that his department would be stronger without him).[8]

F

In count six, Gooden claims Epcot and Smith intentionally interfered with his contract with Cheyney to teach and conduct research in the university's lab space. (Pl's Third Am. Compl. ¶¶ 171–75.)

A plaintiff alleging intentional interference with existing contractual relations under Pennsylvania law must show (1) a contract exists between the plaintiff and a third party, (2) the defendant intends to harm the plaintiff by interfering with the

---

[8]  To the extent Gooden alleges Walton also defamed him by placing the written reprimand in his personnel file, this statement is privileged. *See Agriss v. Roadway Express, Inc.*, 483 A.2d 456, 463–64 (Pa. Sup. Ct. 1984).

contract, (3) the lack of a privilege or justification and (4) actual damage. *Salsberg v. Mann*, 262 A.3d 1267, 1270 (Pa. Sup. Ct. 2021) (citing Restatement (Second) of Torts § 766). The second and third elements respectively require the plaintiff to show the defendant acted with the "specific purpose" of harming him and improperly. *Phillips v. Selig*, 959 A.2d 420, 429–30 (Pa. Sup. Ct. 2008).

Gooden has plausibly alleged Epcot, through its CEO, intentionally interfered with his contract with Cheyney to use university lab space. Gooden contends he lost access to room 308 or an adequate alternative when Epcot began leasing and took control of the science building before the spring 2020 semester. Gooden asserts Epcot did so only after he rejected its offer to finance a valuable product being researched in the science building—namely, Gooden's herpes and cancer treatment. (*Id.* at ¶¶ 26–27.) According to Gooden, Epcot never returned his research. (*Id.* at ¶ 86.)

Gooden has, for now, plausibly alleged Epcot, through Smith, improperly sought to harm Gooden by appropriating his lucrative research. *See Phillips*, 959 A.2d at 429. As a result, Gooden's contract with Cheyney was vitiated and he suffered potentially significant monetary harm. *See Salsberg*, 262 A.3d at 1270.[9]

An appropriate Order follows.

---

[9]     The Commonwealth Defendants argue Gooden's request for declaratory relief—specifically, that the Court declare Defendants' conduct violates the U.S. and Pennsylvania Constitutions—does not satisfy Article III of the former. (Pl's Third Am. Compl. Prayer for Relief). Declaratory relief is inappropriate to solely "adjudicate past conduct" or proclaim one party's liability to another. *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (citing Fed. R. Civ. P 57 and 28 U.S.C. 2201); *see Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004). It would be improper here because Gooden is merely seeking a declaration that Defendants violated constitutional law.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.